JASPER PETROLEUM CO. *v.* STORK OIL CO.

MINES AND MINERALS—OIL AND GAS WELLS—TITLE.
> In suit to establish plaintiff's interest in a productive oil well, finding of trial court that plaintiff's president paid consideration to drilling company for interest in another oil well project which turned out to be unprofitable with the express knowledge, consent and approval of plaintiff *held,* sustained by the evidence.

Appeal from Saginaw; Martin (William H.), J. Submitted June 18, 1935. (Docket No. 122, Calendar No. 38,302.) Decided September 9, 1935.

Bill by Jasper Petroleum Company, a Michigan corporation, against Stork Oil Company, a Michigan corporation, Fred W. Stork, and Simrall Pipe Line Company, a corporation, for a conveyance of oil rights, an accounting, an injunction and appointment of receiver. From decree for defendants, plaintiff appeals. Affirmed.

*Otto, Holland & Otto,* for plaintiff.

*A. Elwood Snow,* for defendants Stork Oil Company and Fred W. Stork.

Edward M. Sharpe, J. Plaintiff is a corporation with Albert Kipp, president, and Carl Reinig, secretary and treasurer, organized for the purpose of acquiring interests in productive oil leaseholds and has never actively engaged in the drilling of wells. The Stork Oil Company is engaged in the drilling of wells and producing oil, while the Simrall Pipe Line Company is only a nominal defendant and is engaged in the pumping of oil to a central depot and selling the same therefrom.

The facts in connection with this case are as follows: The Michigan Pacific Oil & Gas Company being interested in the development of oil land in Midland county had secured from the owners a large number of leases. In May, 1932, this latter company entered into an agreement with the Stork Oil Company for the drilling of certain wells, one of which was drilled upon the Hoyt property. In August, 1932, plaintiff company purchased from the Stork Oil Company an interest in the Hoyt well for the sum of $1,000 and was to pay an additional $1,000 if the well turned out to be a producer. This well turned out to be a dry hole. In December, 1932, the Stork Oil Company entered into another agreement with the Michigan Pacific Oil & Gas Company whereby it

assumed the obligation of drilling certain wells and thereby acquiring an interest in the leases of said gas company.

One of the leases to be developed under this December agreement was known as the Richmond lease of 40 acres and the drilling on this property was commenced by the Stork Oil Company on or about March 15, 1933. At or about this time Goll, Graves & Mechling, oil operators in the Midland territory, had secured from the Stork Oil Company a written agreement authorizing the drilling on 20 acres in this same general territory, known as the Otway property. Because of financial conditions both the Stork Oil Company and Goll, Graves & Mechling were desirous of selling interests in their leases in order to acquire funds to carry on drilling operations. In connection with this situation a contract for the sale of an interest in the Otway lease was prepared by Goll, Graves & Mechling and submitted to plaintiff company. The purchaser was to pay $1,000 upon signing the agreement. On April 3, 1933, the board of directors of plaintiff company authorized its officers to purchase a one-eighth interest in a drilling project with the Stork Oil company, and also a like interest with Goll, Graves & Mechling provided the money involved in said deals was available. On April 28, 1933, the plaintiff company through its president, Mr. Kipp, called at the office of the Stork Oil Company and there entered into an agreement relative to the Richmond lease for an interest and was to pay $1,000 for the same and an additional $1,000 if the well turned out to be a producer. This agreement was signed by the interested parties, but no money was paid upon said lease at this meeting and the record does not definitely disclose whether this agreement was turned over and delivered to plaintiff company at this time or later.

On May 4, 1933, the well on the Otway lease began to show signs of oil and on the same day Mr. Kipp, president of plaintiff company, called at the office of the Stork Oil Company and paid $900. On May 5th, the Stork Oil Company turned over the $900 paid by Mr. Kipp and the balance of $100 to Mr. Graves of the firm of Goll, Graves & Mechling. Shortly after this happening the well on the Richmond lease began producing oil in paying quantities, while the well on the Otway lease was in a financial way a losing venture. ·

The trial court found that the moneys paid by plaintiff on March 4th and 8th were received by the Stork Oil Company and paid out by it to Goll, Graves & Mechling under an express understanding and arrangement, by direction and with the express knowledge, consent and approval of the plaintiff; and entered a decree accordingly. From this decree plaintiff appeals.

It is the contention of plaintiff company that their board of directors never gave Mr. Kipp, their president, any authority to sign a contract on the Otway lease and none was ever executed, and further that when the $1,000 was paid to Miss Dorothy Stork of the Stork Oil Company, it was with the definite understanding that the money so paid was to apply upon the Richmond lease, while the Stork Oil Company contends that the $1,000 paid by Mr. Kipp of plaintiff company was to apply upon the Otway lease and ·in conformity therewith was to be paid to Goll, Graves & Mechling on May 5, 1933.

Fred W. Stork, president of the Stork Oil Company, testified as follows:

"*Q*. Mr. Stork, on April 28, 1933, you had a conference with Mr. Kipp and Mr. Reinig respecting the Jasper Petroleum Company?

"*A.* Yes, Mr. Holst and my daughters were also present. The paper dated April 14, 1933, exhibit E, was the matter under discussion. That is about the Jasper Petroleum Company taking a ⅛ interest in the Richmond lease. Those papers were signed and executed that day. The purpose of signing this contract on that day was because I was going to Texas the next day. I was giving them a couple of days to raise the money to complete the deal, and that could be done in my absence. At that conference I talked with Mr. Kipp about the Goll, Graves & Mechling well.

"*Q.* What was the conversation you had there?

"*A.* Regarding the first payment. $1,000 to be paid to Goll, Graves & Mechling.

"*Q.* What was said about it?

"*A.* Both deals were hot; ready to be closed. They were buying an interest in our well, at least the same as they were in other wells at that time, and they agreed that they would take an interest in both wells. Of course, Goll, Graves & Mechling wanted money, and so did we.

"*The Court*: Did Mr. Kipp say you might turn over the money to Goll, Graves & Mechling.

"*A.* That was understood by all of us. I said, 'Daughter you turn that over to them.' Mr. Kipp heard these instructions, that the first $1,000 was to be paid on the Goll, Graves & Mechling well. He understood he was to pay it at our office, and that it was to be turned over to Goll, Graves & Mechling."

Dorothy Stork, a witness produced on behalf of defendant Stork Oil Company, testified as follows:

"*Q.* Did Mr. Kipp call at the office on May 4, 1933?

"*A.* He did in the morning. He said he had $900. We talked about the Goll, Graves & Mechling matter. I said, 'Mr. Graves does insist he get this money. I know Mr. Graves will appreciate the money.' He said he had the $900 and said to take it. I told Mr.

Kipp I would take $100 from the Stork Oil Company till and pay the $1,000. He said that would be fine and he gave me the money. I said, 'The next time I wish you would bring me in another $1,000.' I gave him a receipt for that $900 and took $100 from the Stork Oil Company, and called Mr. J. C. Graves and told him we had $1,000 from Mr. Kipp, and when could he come down and get it, and he came down and got the $1,000.

"*Q.* Did you tell him who it was for?

"*A.* Yes, I told him 'This is for Mr. Kipp's interest in the Goll, Graves & Mechling well—the first $1,000.' I gave it to Mr. Graves and got a receipt for it.

"*The Court*: When Mr. Kipp called at your office on May 4th and said he had $900, did you say what you would do with it?

"*A.* We talked about the Goll, Graves & Mechling well. I told him Mr. Graves was insisting that he get this money because his well was coming in. He said, 'That will be fine,' and I said I would take $100 from our till. I don't know whether he misunderstood it, but I made it very plain to him as far as I could."

Mr. Graves, another witness produced on behalf of defendants, testified as follows:

"*Q.* Did you ever receive a payment on that well from Mr. Kipp, or any sum of money?

"*A.* Yes.

"*Q.* And who did you receive the money from?

"*A.* Stork Oil Company. * * *

"*Q.* When you received that from the Stork Oil Company, what person paid it?

"*A.* Miss Dorothy Stork. * * *

"*Q.* On what day was it that you received the money?

"*A.* May 5th. Our bank records show that we received the money on that day. * * *

"*A.* I knew what the $1,000 was for when I received it. The Stork Oil Company did not owe us

$1,000 at that time. I did not expect any sum of money from the Stork Oil Company, except the Jasper Petroleum Company money. In our records we have given the Jasper Petroleum Company credit for the $1,000 on that well. We have allotted oil that has been produced from that well to the Jasper Petroleum Company, and it is standing there with the money on deposit for them, segregated."

While it is true that all of the witnesses produced are more or less interested in the outcome of this case, yet we think the evidence produced sustains the holding of the trial judge. We must therefore hold that the only rights that plaintiff has are in connection with the Otway lease.

The decree of the lower court is affirmed, with costs to defendants.

POTTER, C. J., and NELSON SHARPE, NORTH, FEAD, WIEST, BUTZEL, and BUSHNELL, JJ., concurred.